J-S06004-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DARNESE DARREL RAINES | : | |
| | : | |
| Appellant | : | No. 478 WDA 2025 |

Appeal from the Judgment of Sentence Entered December 4, 2024
In the Court of Common Pleas of Beaver County Criminal Division at
No(s): CP-04-CR-0000561-2023

BEFORE: KUNSELMAN, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: JULY 27, 2026**

Darnese Raines appeals from the judgment of sentence entered after a jury found him guilty of first-degree murder and possessing an instrument of crime.[1]  He challenges the sufficiency of the evidence to convict him of these offenses and also claims that the verdict was against the weight of the evidence.  Upon review, we affirm.

The trial court summarized the evidence from trial as follows:

The incidents giving rise to the charges in the Criminal Information are alleged to have occurred during the evening hours of November 9, 2021, at the apartment complex of Linmar Terrace in the City of Aliquippa, Pennsylvania.  At that time, the victim, B.M., was shot four times in the head and neck.  She was found two days later in her apartment, lying naked in a pool of blood.  At trial, the Commonwealth first presented the testimony of Aisa Martin, a friend of the victim.  Ms. Martin testified that she was at

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502(a) and 907(b).

the victim's residence on November 9, 2021, around 5:15 p.m. Ms. Martin stayed at the apartment for about an hour and a half. She described the condition of the apartment to be clean, as the victim had been actively cleaning the apartment during the visit.

After Ms. Martin left the apartment, she did not have any further contact with the victim. Ms. Martin testified that she called the victim multiple times over the next two days, but received no answer. On November 11, 2021, Ms. Martin went to check on the victim at her apartment. Ms. Martin testified that she entered the apartment and discovered the victim in her living room. The victim was lying on the floor, naked in a pool of blood. Ms. Martin testified that the living room was in disarray. She additionally stated that she saw a pink, silk robe in the living room. According to Ms. Martin, the victim usually wore this robe during encounters with sexual companions.

On cross examination, Ms. Martin was questioned whether she knew of any particular male companions that the victim had around the time of the incident. Ms. Martin testified that she knew of someone by the name of "Sonny." She explained further that she believed this was a cover name used by the victim for whenever she had an intimate companion. Ms. Martin testified further that, during the police investigation, she informed investigators that she was aware of an incident where Sonny had choked the victim. During the course of that interview, Ms. Martin also informed investigators about a conversation she overheard between the victim and Sonny. She stated that Sonny was trying to get the key to the victim's apartment, but the victim was unwilling to comply with that request. Ms. Martin testified further that she learned that the victim owed Sonny money. She explained that the victim sold drugs, including weed and heroin, for Sonny. When asked about Sonny's physical characteristics, Ms. Martin was unable to provide any description.

[T]he Commonwealth presented the testimony of Trooper Michael Pickard, a member of the Forensic Services Unit for the Pennsylvania State Police. Trooper Pickard testified that the state police received a call from local police on November 11, 2021, requesting assistance for a homicide scene at Linmar Terrace. Trooper Pickard was one of the troopers sent to aid in the investigation [and] conducted a walk-through of the apartment alongside Trooper DeLuca and Trooper Peth.

Trooper Pickard testified that various tent markers were placed at the scene in the living room. Trooper Pickard explained that the scene appeared to reflect the involvement of some sexual activity, as there were various sexual items located in the room. The investigators identified condom packages, a glass smoking pipe, a water bottle, a bottle of lubricant, cigarette butts, and a pink lingerie robe. Bullet fragments were also recovered, but [] no spent shell casings were found. Trooper Pickard later testified that he attended the victim's autopsy, where a rape kit and bullet fragments were collected from the decedent.

Next, the Commonwealth presented the testimony of Dr. Tanner Bartholow, a forensic pathologist . . . . Dr. Bartholow testified that she conducted the forensic autopsy of the victim on November 12, 2021.

When discussing the results of the autopsy, Dr. Bartholow explained there was one gunshot wound at the right cheek with an exit wound behind the left ear, a second gunshot wound at the left cheek, with a bullet fragment recovered from the decedent, a third gunshot wound at the left interior chin with a partial exit wound on the left cheek and a partial bullet fragment recovered from the decedent, and a fourth gunshot wound at the anterior portion of the neck with an exit wound on the right posterior of the neck . . . . [S]he explained that, given the circumstances, swabs of the victim's genitalia, anus, and mouth were completed. Specifically, she determined swabs were necessary because the victim was found without clothing. Such swabs were packaged separately and sent for testing. When questioned about the victim's cause of death, Dr. Bartholow opined that the cause of death was homicide, resulting from the gunshot wounds of the head and neck.

On the second day of the trial, the Commonwealth presented the testimony of Kimberly Washington, a resident of Linmar Terrace. Ms. Washington testified that she lived next door to the victim's unit. Ms. Washington stated that she heard a loud noise on the night of November 9, around 10:00 p.m., but didn't realize they were gunshots until she was visited by police. When asked if she had any video cameras, she testified that she had a Ring camera at the back of her apartment which had relevant footage on the night in question. Such footage was introduced as Commonwealth's Exhibit 70 and was displayed for the jury.

Trooper Dillion Burkarth, another state trooper who participated in the investigation, explained the contents of the Ring footage. The video first showed a male lurking outside Ms. Washington's apartment walking in the direction of the victim's residence around 9:50 p.m. Later in the footage, that same male is seen fleeing from the area of the victim's apartment around 10:31 p.m. At one point in the video, around the 9:50 p.m. timeframe, the individual is perceived to duck under a clothesline pole, which was measured to be 74 inches. Based on this information, the individual in the footage was believed to be just below 74 inches, or around 6'2" in height.

Later, Trooper Burkarth testified that two phones were recovered from the apartment unit [belonging to the victim]. Cell phone data extractions were performed on both phones [disclosed/revealed] a person of interest under the contact name "Darnese." Data extracted from the phones included voicemails and text messages from August 2021. Trooper Burkarth testified that there was a gap in communication between [Raines] and the victim until November. From November 6, 2021, to November 9, 2021, [Raines'] had communicated with the victim multiple times via text and phone. In that time span, [Raines] had communicated with the victim thirty-six times. As a result, search warrants were issued for [Raines] cell phone records and DNA. His text messages, among other things, included messages in August which suggested that there was a falling out between [Raines] and the victim. There was no more communication until November 6, 2021, when [Raines] reinitiated phone communication with the victim. . . . Trooper Burkarth later testified that the glass pipe, four cigarette butts, a cigar butt, the sexual assault kit, and comparison DNA were all sent for testing.

To explain the DNA results, the Commonwealth presented Doctor Hai Sheng Li, a Forensic Scientists for the Pennsylvania State Police. Dr. Sheng Li testified that [Raines'] DNA was found on the water bottle and cigarettes in the apartment. Results from the DNA kit also revealed traces of [Raines'] semen inside of the victim's rectum.

On the next day of testimony, the Commonwealth presented the testimony of Lieutenant Matthew Bonin, a Cellular Analysis Technician with the Pennsylvania State Police. Lieutenant Bonin testified that he examined the cell cite location information related to [Raines] on September 9, 2021. Based on the cellular connection data, Lieutenant Bonin explained that [Raines] was

near a cell tower within the area of Linmar Terrace around the time of the murder.

Trooper Burkarth was recalled and presented testimony related to an interview he conducted of [Raines]. The interview was recorded and was submitted as Commonwealth's Exhibit 122. During the interview, [Raines] first denied knowing the victim, but later recanted. [Raines] additionally denied having any sexual relationship with the victim, but recanted that as well when he was confronted with the fact that his DNA was found inside the victim's rectum. Furthermore, [Raines] denied being at Linmar Terrace at the time of the murder, but later stated that he was there, but at a different unit.

Trial Court Opinion, 6/5/25, at 3-10 (footnotes omitted).[2]

On October 17, 2024, the jury found Raines guilty of first-degree murder and possession of a weapon/firearm. On December 4, 2024, the trial court sentenced Raines to life imprisonment. Raines filed a post-sentence motion, which new counsel amended, asking for a judgment of acquittal. The court denied Raines' motion.

Raines filed this timely appeal. He and the trial court complied with Appellate Rule 1925. On appeal, Raines raises the following two issues:

I. Did the trial court err in failing to grant [Raines'] motion for judgment of acquittal by finding the verdicts for homicide of the first degree and possession of a weapon were supported by sufficient evidence?

II. Did the trial court abuse its discretion in denying [Raines'] motion for a new trial by finding the guilty verdicts for homicide of the first degree and possession of a weapon were not so

_____

[2] The trial court noted that the victim was a biological male but was in the process of transitioning to a female by the time of her death. *See id.* at 3 n. 11.

contrary to the weight of the evidence so as to shock one's sense of justice?

Raines' Brief at 9.

In his first issue, Raines challenged the trial court's order denying his motion for judgment of acquittal based on the sufficiency of the evidence to convict him of first-degree murder and possession of a weapon. Specifically, Raines claims that the evidence was insufficient to establish that he was the one who killed the victim, and that he possessed a weapon (because he was not the one who shot the victim). Raines acknowledges that circumstantial evidence may be used to establish the identity of a perpetrator, but he maintains that, in this case, it was too tenuous. Raines' Brief at 16.

First, Raines argues that certain statements he made to police during his interview were not incriminating but misinterpreted. He maintains that his comment to police about his relationship with the victim merely reflected a certain standard of behavior in the transgender community rather than indicating that his relationship with the victim was contentious; he and the victim had an amicable relationship. Additionally, Raines maintains that his unsolicited statement he did not kill anyone was because he lives in an area with a high rate of violent crime, not his guilty conscience. Raines' Brief at 17.

Raines further argues that other evidence of the Commonwealth did not support his convictions. Specifically, he maintains that: the fact that the victim's and his cell phones were located in the same neighborhood was not

abnormal;  the fact that the victim's and his communication ceased after they had intercourse was not unusual, particularly where secrecy was needed; the characteristics of the individual in the ring camera footage were different than his; and the police did not find the weapon.  *Id.* at 17-19.

Additionally, Raines claims that because the evidence was insufficient to prove he was the individual who killed the victim, he could not be guilty of possession of a weapon.  Instead, according to Raines, the Commonwealth's evidence that he possessed and concealed a gun related solely to whomever murdered the victim.  *Id.* at 19-20.

We disagree.

In reviewing a sufficiency of the evidence claim,

> we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder.  The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011) (citations omitted).  However, "the inferences must flow from facts and circumstances proven in the record and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt."  *Commonwealth v. Scott,* 597 A.2d 1220, 1221 (Pa. Super. 1991).  "The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under

the limited scrutiny of appellate review." ***Id.*** "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Diamond***, 83 A.3d 119, 126 (Pa. 2013).

To support a guilty verdict for first-degree murder, our Supreme Court has held that the Commonwealth must prove all three of the following elements beyond a reasonable doubt: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. ***Commonwealth v. Jordan***, 65 A.3d 318, 323 (Pa. 2013).

A person commits the offense of possession of a weapon "if he possesses a . . . weapon concealed upon his person with intent to employ it criminally." 18 Pa.C.S. § 907(b).

"In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." ***Commonwealth v. Smyser***, 195 A.3d 912, 915 (Pa. Super. 2018) (citation omitted). "Evidence of identi[ty] need not be positive and certain to sustain a conviction." ***Id***. "[A]ny indefiniteness and uncertainty in the identification testimony goes to its weight. Direct evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial evidence." ***Id***. (citing ***Commonwealth v. Hickman***, 309 A.2d 564, 566 (Pa. 1973)). Additionally, "[c]lothing and physical characteristics may be used in tandem with other circumstantial evidence to validly establish the identity of

a perpetrator." ***Commonwealth v. Taylor***, 2354 EDA 2020, 2021 WL 6015856, at *4 (Pa. Super. filed Dec. 21, 2021) (unpublished decision) (citing ***Commonwealth v. Orr***, 38 A.3d 868, 874 (Pa. Super. 2011) (*en banc*)).

Following our review of the record, we agree with the trial court that there was sufficient evidence to prove that Raines was the one who shot and killed the victim. The trial court aptly summarized the pertinent evidence and explained:

> Here, the evidence established that the victim was unlawfully killed. Additionally, evidence of fatal gunshot wounds to the head and neck area establish that such act was done with specific intent. ***Commonwealth v. Rega***, 933 A.2d 997, 1009 (Pa. 2007) (holding that the use of a deadly weapon on a vital part of the body is sufficient to establish die specific intent to kill). Moreover, a specific intent may be inferred where the victim was shot in the head, which is a vital part of the body. ***Commonwealth v. Bedford***, 50 A.3d 707, 712 (Pa. Super. 2012).
>
> Therefore, the sole issue before the jury was whether [Raines] was responsible for the killing.
>
> ***
>
> [I]t is clear that there was a sexual encounter prior to the victim's death. She was found naked, with various sexual items found around the living room, including condoms, lubricant, and the victim's pink robe, which she often wore during intimate encounters. The DNA profile of sperm collected from the victim's rectum, and saliva collected from cigarette butts and a water bottle found in the living room all matched [Raines'] DNA profile.
>
> [Raines] also denied having any sexual contact with the victim, but recanted when state troopers confronted him with DNA evidence, claiming that he had sex with the victim months prior to the murder. [Raines] also denied that he was at Linmar Terrace on the night in question, but later stated he was, but at a different unit other than the victim's unit. Such inconsistent statements led the jury, through its verdict, to find that [Raines] was not credible. Evidence at trial also included footage that depicted an

individual lurking outside the victim's apartment and fleeing from the apartment around the time of the murder. While this footage did not clearly depict the identity of the suspect, the jury was able to ascertain the suspect's general height, which matche[d] that of [Raines]. Cell site location information confirmed that [Raines] was in the area around the time of the homicide.

***

[Raines] [] was placed at the scene of the crime through the use of circumstantial evidence of [Raines'] semen discovered on the decedent. This evidence posits that [Raines] was with the victim close to the time of death, corroborating proof of identity.

Viewing the evidence in a light most favorable to the Commonwealth, the evidence was sufficient for the jury to conclude, beyond a reasonable doubt, that [Raines] committed the crime, as the evidence established his participation in a sexual encounter with the victim and placed him at the scene around the time of death. Thus, the evidence was sufficient to support [Raines'] conviction of [m]urder of the [f]irst [d]egree.

Trial Court Opinion, 6/5/25, at 12-15 (footnotes omitted).

We further observe, as the Commonwealth emphasizes, other details of the evidence presented that support Raines' conviction: there was frequent communication between the victim and Raines before the incident, but none after; there was no forced entry indicating that the victim knew the assailant, which was corroborated by the fact that the victim was anticipating a sexual encounter because her pink robe was found at the scene; the neighbor heard a strange noise around the time of the incident which later was believed to be the muffled sound of gunshots; although other's had been in the victim's apartment, Raines' DNA was prevalent; and significantly, the timeframe that semen can survive in a person's body is very short, demonstrating that the

victim and Raines had a sexual encounter immediately before the victim was killed. *See* Commonwealth's Brief at 23-26.

The evidence was also sufficient to establish that Raines, who killed the victim, used a gun to shoot her. This is so, even though, no firearm was recovered in this case. In **Commonwealth v. Woodbury**, 477 A.2d 890 (Pa. Super. 1984), we held that possession of an instrument of crime could be established on purely circumstantial evidence. We explained:

> Once the factfinder concluded that the appellant was the slayer and that the death resulted from the infliction of a gunshot wound, the factfinder could logically have concluded from all of the evidence that appellant had possession of a gun, that the gun was an instrument commonly used for criminal purposes, and that his possession of the gun was, under the circumstances, not manifestly appropriate for any lawful use that the gun may have had. **See Commonwealth v. Keaton**, 419 A.2d 578, 580 (Pa. Super. 1980) (where a conviction for possessing an instrument of crime was upheld based only upon circumstantial evidence and with an absence of any direct evidence of actual physical possession of the weapon). Therefore, appellant's conviction for this offense was grounded upon competent evidence.

**Id.** at 893-94.

Here, as the trial court explained:

> Dr. Bartholow confirmed that the victim suffered four fatal gunshot wounds to the head and neck, establish that a firearm was used. As per the preceding homicide analysis, there was sufficient evidence to establish that [Raines] was responsible for the killing and find him guilty of [m]urder of the [f]irst [d]egree. This killing was committed with a firearm.

Trial Court Opinion, 6/5/25, at 16. Additionally, the Ring doorbell footage showed that the firearm was concealed on the perpetrator's person.

Thus, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that there was sufficient evidence to convict Raines of first-degree murder and PIC. Raines essentially asked this Court to reinterpret the evidence in a light most favorable to him. This we cannot do. It was within the jury's province to interpret the evidence in a light favorable to the Commonwealth, *i.e.*, as an admission of guilt. ***Commonwealth v. Charlton***, 902 A.2d 554, 562 (Pa. Super. 2006). Accordingly, Raines' sufficiency claims are without merit.

In his second issue, Raines claims that the verdict was against the weight of the evidence so as to shock one's sense of justice. In his appellate brief, Raines does not specify how the trial court abused its discretion or why he thought the verdict was against the weight of evidence. Raines' Brief at 20. Notwithstanding this, we conclude that the trial court did not abuse its discretion in denying Raines' weight claim.

When reviewing a challenge to the weight of the evidence, our standard of review is as follows:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. **Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion**.
>
> * * *
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts,

certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

\* \* \*

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013) (citations omitted) (emphasis added). Absent an abuse of discretion, the trial court's decision will not be disturbed. *See Commonwealth v. Griffin*, 515 A.2d 865, 869 (Pa. 1986).

An abuse of discretion "is not merely an error in judgment. Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law." *Commonwealth v. West*, 937 A.2d 516, 521 (Pa. Super. 2007). By contrast, a proper exercise of discretion "conforms to the law and is based on the facts of record." *Id.* "The trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Diggs*, 949 A.2d 873, 879–80 (Pa. 2008).

To prevail on a challenge to the weight of the evidence, "'the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court.'" *Commonwealth v. Talbert*, 129 A.3d 536, 546 (Pa. Super. 2015) (quoting *Commonwealth v. Sullivan*, 820 A.2d 795,

806 (Pa. Super. 2003)). A trial court's denial of a motion based on a weight claim "is the least assailable of its rulings." **Diggs**, 949 A.2d at.

Here, the trial court concluded that the jury's verdict was not so contrary to the evidence as to shock one's conscience. In reaching this decision, the court considered the evidence at trial. The court noted that:

> The Commonwealth presented ample evidence, both circumstantial and direct, to sustain guilty verdicts on the counts at issue. During the [Raines'] police interview, there were multiple contradictory statements, which ultimately confirmed a sexual relationship between [Raines] and the victim. [Raines] additionally stated in the interview that he was at Linmar Terrace on the night of November 9, 2021, but at a unit other than the [victim's]. Most importantly, the forensic evidence establishes that [Raines] was at the victim's apartment on the evening of November 9, 2021, and was the individual that engaged in a sexual encounter with the victim prior to the murder.

> While [Raines] argues excessive weight was given to DNA evidence, determining the weight of the evidence presented at trial is exclusively the duty of the jury. **Commonwealth v. Champney**, 832 A.2d 403, 408 (Pa. 2003). Video evidence was presented from which the jury could find that the [Raines] was in the proximity of the victim's apartment. There was evidence of [Raines'] DNA on the victim and on property in the apartment. [Raines'] statements were played which showed [Raines] altered his story from not knowing the victim, to a version of the story where he was in the apartment of the victim. Cell phone evidence placed him in the area of the shooting and cell phone messages and call logs reflected communication between [Raines] and the victim that would place [Raines] in some degree of a relationship with the victim. Thus, such evidence was not tenuous, vague or uncertain. For these reasons, [Raines'] verdict of guilt was not against the weight of the evidence [so] as to shock the conscience of justice.

Trial Court Opinion, 6/5/25, at 18-19.

Upon review of the record and the trial court's review of the evidence and its rationale, we conclude that the trial court acted within its discretion when it denied Raines' post-sentence motion challenging the weight of the evidence. Raines' second issue also merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/27/2026